Sebastian Rucci (SBN 178114)
LAW OFFICES OF SEBASTIAN RUCCI, P.C.
16400 Pacific Coast Highway, Suite 212
Huntington Beach, CA 92649
Tel: (562) 901-0199
Cell: (330) 720-0398
Fax: (562) 249-6910
Sebastian@Rucci.Law
Attorney for Plaintiffs

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA
# WESTERN DIVISION

| | |
|---|---|
| Cuper Development LLC, Go Cudahy LLC, Davina LLC, Genius Distribution LLC, Herbal Dragon LLC and Daniel & Goliath LLC,<br><br>        Plaintiffs<br><br>vs.<br><br>City of Cudahy, a municipal corporation; and Alfonso Noyola; Elizabeth Alcantar; Martin Fuentes; Cynthia Gonzalez; Daisy Lomeli; Joshua Calhoun; Raul Diaz, Cecilia Madrigal-Gonzalez; and Louis Morales.<br><br>        Defendants | Case No:<br><br>Judge:<br><br>Magistrate:<br><br>**VERIFIED COMPLAINT**<br>(1) Breach of Contract; (2) Violation of the Racketeer Influenced and Corrupt Org. Act, 18 U.S.C. § 1962(c); (3) Conspiracy to Violate the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d); (4) Violation of Equal Protection, 42 U.S.C. § 1983; (5) Violation of Due Process, 42 U.S.C. § 1983; (6) Violation of Gov. Code § 66020; (7) Declaratory Judgment (Operating Fees Are Illegal Tax); (8) Declaratory Judgment (Operating Fees Are Illegal Impact Fees); and (9) Wrongful Use of Administrative Proceedings |

## VERIFIED COMPLAINT

COME NOW the Plaintiffs and for their claims against Defendants state as follows:

**INTRODUCTION**

1.      In 2018, over 70 months ago, the City of Cudahy issued permits to Plaintiffs to operate a cannabis facility pursuant to Development Agreements (Exhibit 1). The City agreed to certain conditions and expedited processes. The City agreed that any delays caused by the City, like the 15-month shutdown for the coronavirus pandemic, would result in waivers of operating and other fees. The City breached the Development Agreements by seeking operating fees while the Plaintiffs were not operating and refusing to waive fees for delays caused by the City. Plaintiffs made the City aware of its breaches (Exhibits 2 and 3). The City refused to hold annual review hearings during the 70-month period, which prevented Plaintiffs from presenting their claims for fee waivers due to force majeure delays.

2.      After spending more than $10 million, and 70 months after starting construction, only one of the six Operators has been able to open, and only because it agreed to pay disputed fees and only remains open with a temporary permit renewed upon paying illegal fees. The other five Operators are still closed and facing revocation for refusing to pay illegal fees. The Defendants' tactics became more aggressive once City Manager, Alfonso Noyola was hired, including the demand to force the sole operating Plaintiff to pay illegal fees include a text message demanding immediate payment of $200,000 or face revocation.

3.      During the past 70 months, the Plaintiffs paid almost $3/4 million in fees and attempted to negotiate in good faith with the City for over two years since the newly hired City Manager, Defendant Alfonso Noyola arrived, but Defendants have refused to comply with the Development Agreements and City and State Laws, after investing over $10 million, development efforts ground to a halt in the face of the City's efforts to exact illegal fees from them, which are not required under the Development Agreements.

4.      After exhausting two years of effort to resolve the demand for illegal fees, the Plaintiffs provided the City with a Notice to Cure (Exhibit 2), giving the City 30 days to remedy their breaches. The Plaintiffs also offered to post a bond for the disputed fees and proceed under protest. Despite this option, the City and its legal representatives remained silent (Exhibit 3). They did not respond or seek additional time to cure the detailed breaches.

5.     The City's actions in demanding illegal fees are detailed below and confirmed by the attached letters, invoices, and emails (Exhibit 4). The allegations support claims for damages against the City for Breach of Contract (Count 1), for damages for violating Plaintiffs' rights to Equal Protection and Due Process under 42 U.S.C. § 1983 (Counts 4 and 5), and damages for violation Gov. Code § 66020 for refusing to allow the Operators to proceed under protest by posting a bond for the disputed fees (Count 6), and claims for wrongful use of administrative proceedings for the illegal revocation hearings (Count 9).

6.     The allegations also support claims for declaratory relief, as the operating fees are an illegal tax undertaken without a public voting and declaratory relief that the operating fees are illegal impact fees undertaken without proper findings (Counts 7 and 8).

7.     The Development Agreements permitted damages against each individual Defendant. Plaintiffs believe they engaged in a pattern of racketeering activity by attempting to obtain fees that were not due. Defendants' actions constitute predicate acts of extortion under the color of law, extortion under fear of economic loss, mail fraud, and wire fraud.

8.     The individual Defendants were notified that their actions supported claims of civil RICO against them individually (Exhibit 2). They did not respond to the claims or change their conduct (Exhibit 3). Instead, they sought to retaliate by illegally revoking the Development Agreements. Their actions support claims for civil RICO (Count 2) and conspiracy to violate RICO (Count 3). City of Cudahy is not a defendant in Counts 2 and 3.

JURISDICTION AND VENUE

9.     There are multiple bases for this court's jurisdiction. This Complaint alleges violation of Plaintiffs' rights under the United States Constitution, giving this court original "federal question" jurisdiction pursuant to 28 U.S.C. §1331 over those claims.

10.     **Civil Rights Jurisdiction**. This Complaint also alleges violations of the Plaintiffs' rights under the Federal Civil Rights Act, 42 U.S.C. §1983, to redress the deprivation, under color of law, of rights secured by the United States Constitution, giving this court original jurisdiction under 28 U.S.C. §1343(a)(3) and (4) over those claims.

1    11.    **Civil RICO Jurisdiction**. This Complaint also alleges violations of the

2    Plaintiffs' rights under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.

3    §§ 1961-68, in connection with a scheme by various defendants to conduct the affairs of the

4    City of Cudahy through a pattern of racketeering activity, and to conspire to do so, giving this

5    court jurisdiction over those claims pursuant to 18 U.S.C. § 1964(c).

6    12.    **Supplemental Jurisdiction**. This Complaint also alleges violations of

7    guarantees embodied in the California Development Agreement Statute (Gov. Code § 65864,

8    *et seq*.); violations of guarantees embodied in the California Mitigation Fee Act Statute (Gov.

9    Code § 66000 *et seq*.); violations of the right to bond fees and proceed under protest (Cal

10   Gov. Code § 66020); violations of guarantees requiring electoral approval of impositions of

11   taxes such as the operating fees (Gov. Code, §§ 53722, 53723; Cal Const Art XIII A §4) and

12   claims for breach of contract for breach of the Developments Agreements. These claims give

13   this court supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) because those claims "are

14   so related to claims in the action within such original jurisdiction that they form part of the

15   same case or controversy under Article III of the United States Constitution."

16   13.    **Personal Jurisdiction and Venue**. There are multiple bases for this court's

17   personal jurisdiction and venue, including 28 U.S.C. § 1391(b)(1) ("judicial district where

18   any defendant resides") because the defendants are located in, and transact their affairs in the

19   City of Cudahy, California which is located in Los Angeles County within the geographical

20   area of this court. See 28 U.S.C. § 84(c)(2) (Western Division of the Central District of

21   California comprises Los Angeles County). Venue is also proper pursuant to 28 U.S.C. §

22   1391(b)(2) ("judicial district in which a substantial part of the events or omissions giving rise

23   to the claim occurred") because a substantial part of the events giving rise to the claims

24   occurred in the City of Cudahy which is located within the geographical area of this court.

25   14.    Personal jurisdiction and venue of the Defendants is also predicated upon 18

26   U.S.C. § 1965(a) (civil RICO action "may be instituted in the district court of the United

27   States for any district in which such person resides" or "transacts his affairs") because the

28   acts and the affairs of the City are located within the geographical area of this court.

**PLAINTIFFS AND DEFENDANTS**

15.    The Plaintiffs, Cuper Development LLC, Go Cudahy LLC, Davina LLC, Genius Distribution LLC, Daniel and Goliath LLC and Herbal Dragon LLC (collectively "Plaintiffs" or "Operators") are six limited liability companies incorporated in California with development agreements to operate manufacturing facilities in the City of Cudahy.

16.    Defendant, the **City of Cudahy** (the "City" or "Cudahy")), is a municipal corporation located in Los Angeles County with a municipal address at Cudahy City Hall, 5220 Santa Ana Street, Cudahy, California, 90201.

17.    Defendant **Alfonso Noyola**, is the city manager for the City of Cudahy, he manages and controls the day-to-day operations of the City of Cudahy. This Complaint seeks damages against Alfonso Noyola in his individual capacity.

18.    Defendant, **Elizabeth Alcantar**, is the vice mayor of the City of Cudahy, and this Complaint seeks damages against Elizabeth Alcantar in her individual capacity.

19.    Defendant, **Martin Fuentes**, is a council member of the City of Cudahy, and this Complaint seeks damages against Martin Fuentes in his individual capacity.

20.    Defendant, **Cynthia Gonzalez**, is a council member of the City of Cudahy and this Complaint seeks damages against Cynthia Gonzales in her individual capacity.

21.    Defendant, **Daisy Lomeli**, is a council member of the City of Cudahy, and this Complaint seeks damages against Daisy Lomeli in her individual capacity.

22.    Defendant, **Joshua Calhoun**, is the finance director for the City of Cudahy and this Complaint seeks damages against Joshua Calhoun in his individual capacity.

23.    Defendant **Cecilia Madrigal-Gonzalez** is the senior planner for Cudahy and this Complaint seeks damages against Cecilia Madrigal-Gonzalez in her individual capacity.

24.    Defendant, **Raul Diaz**, is an employee for the City of Cudahy and this Complaint seeks damages against Raul Diaz in his individual capacity.

25.    Defendant, **Louis Morales**, is an employee for the City of Cudahy and this Complaint seeks damages against Louis Morales in his individual capacity.

26.     This Complaint refers to defendants the City of Cudahy, Martin Fuentes, Cynthia Gonzalez, Daisy Lomeli, Elizabeth Alcantar, Alfonso Noyola, Joshua Calhoun, Cecilia Madrigal-Gonzalez, Raul Diaz, and Louis Morales collectively as the "Defendants."

27.     Whenever in this Complaint a reference is made to any act done by any Defendant acting individually, the allegation means that the acts of the individual Defendant were done with the knowledge, consent, approval, and ratification of the other Defendants and is thereby attributed to each defendant individually, jointly and severally.

## ARTICLE I - RELEVANT CONTRACTUAL PROMISES

(A).    **The City Agreed that the Development Agreements Bind the City and Future Councils to the Obligations Undertaken**.

28.     Shortly after the adoption of an ordinance allowing commercial cannabis in 2017, the Operators met with City officials about obtaining permits to operate cannabis manufacturing facilities, which the City assured would open within eighteen months. Based on this representation the Operators applied for a permit and development agreement to cultivate, manufacture, and distribute cannabis at 4916 Cecilia Street, in the City of Cudahy.

29.     Initially the City moved quickly as it promised, and on April 30, 2018, the planning commission held a public hearing and received an extensive presentation from its cannabis consultants. Two weeks later, on May 15, 2018, the City adopted Ordinances No. 676 through 682, approving seven Development Agreements one for each Plaintiff.

30.     On June 5, 2018, a total of 2,120 days (70 months or 5.8 years) from the date of this filing, the City executed six Development Agreements, each one comprising 41 pages without counting the exhibits. **EXHIBIT 1** is a true and accurate copy of one of the Development Agreements, all of which are identical. The Development Agreements are statutorily authorized, Gov. Code § 65865(a), and freeze any approvals, rules and regulations governing the project. (Gov. Code § 65866). This allows the Operators to make long-term plans for the project without risking future changes by the City as specified in the agreement.

31.     The City contractual agreed that its promises "shall survive beyond the terms of the present Council members, that this Agreement will serve to bind the City and future Councils to the obligations hereby undertaken." (Dev. Agmt. Recital M).

32.     The City also agreed that its "failure" to "perform any term or provision of this agreement" after a "cure period shall constitute a default" and the Operators "may institute legal proceedings" and "nothing contained herein shall modify or abridge the Operator's rights or remedies (including **its rights for damages**, if any) resulting from bad faith intentional acts, the grossly negligent or malicious acts of the City and its officials, officers, agents, and employees." (Dev. Agmt. § 14(a)).

(B).    **The City Agreed that the Development Agreements Guarantee the Plaintiffs Many Rights Including that the Project is Vested**.

33.     The Development Agreements confirm that the "City concluded that the pursuit of the Project will serve the best interests of its citizens and that the public health, safety, and welfare are best served by entering into this obligation." (Dev. Agmt. Recital M). The Development Agreements also state that the City "found that the Project" is "in the best interest of the City of Cudahy and its residents." (Dev. Agmt. Recital P).

34.     The Development Agreements identify one of its main "purpose" is "to establish certain development rights" in the project "regardless of intervening changes" in order to "reduce the economic risk of development." (Dev. Agmt. Recital A).

35.     The Development Agreements "establish certain development rights" and "vest certain rights in the Operator." (Dev. Agmt. Recital B). "The City agrees the Operator's land use entitlements for the project shall vest" (Dev. Agmt Recital N), that "the Operator may operate cannabis-related activities" (Dev. Agmt. § 4(a)), and that the "property may be used for commercial cannabis" cultivation, manufacturing, and distribution. (Dev. Agmt § 1(c)).

(C).    **The City Incorporated Approved Plans Into the Development Agreements and Contractually Agreed that Redesigning Approved Plans is Considered a Default**.

36.     Each of the Development Agreements incorporated the site and floor plans as an exhibit: "The Operator's site plan and floor plan for the facility are attached hereto as Exhibit D and incorporated into the application." (Dev. Agmt. § 3(a)). The "cannabis permit application" and its detailed construction plans were also incorporated. (Dev. Agmt. § 1(d)).

37.     The Development Agreements provide further, that "the Project will consist of a vertically integrated" facility providing "cannabis production, processing, and distribution" (Dev. Agmt. Recital I), and that the existing "industrial warehouse building" comprising 68,000-square-feet will be divided into seven spaces. (*Id.*) Construction includes the "renovation or remodeling of existing buildings." (Dev. Agmt. § 13).

38.     As noted above, the City contractually agreed in the Development Agreements that its "failure" to "perform any term or provision of this agreement" after "notice and cure period shall **constitute a default**." (Dev. Agmt. § 14(a)). The City also contractually agreed to provide "an extension of time" for "any default by City." (Dev. Agmt. § 23(i)). In effect, the City contractually agreed that any redesign of approved plans would constitute a default by the City and would require fees during this period of delay to be waived.

(D).    **The City Agreed to Expedite Permits and Acknowledged that Delays by the City in Expediting Permits is Considered a Default**.

39.     The City agreed that the "Operator shall receive priority processing for any corresponding City permits." (Dev. Agmt. Rec. F). The City "acknowledge[d] that changes to the project or development plans and related approvals may be appropriate and mutually desirable to carry out the intent and purpose of this agreement." (Dev. Agmt. § 23(n)). The Operators agreed to pay cost recovery fees for any extra expense incurred by the City in expediting permit.

40.     The City agreed in the Development Agreements if conflicting laws "require changes in plans, maps or permits approved by the City, this agreement shall remain in full force" and the parties shall "meet and confer in good faith and attempt to modify this agreement to bring it into compliance" and "the City shall cooperate with Operator in securing any City permits." (Dev. Agmt. § 23(o)). Instead of working with the Operators in good faith to expedite permits, the City billed monthly cost recovery fees while delaying granting requires permits.

41.     Again the City contractually agreed that its "failure" to "perform any term or provision of this agreement" after "notice and cure period shall constitute a default." (Dev.

Agmt. § 14(a)). The City also agreed to provide "an extension of time" for "any default by City." (Dev. Agmt. § 23(i)). In effect, the City contractually agreed that its failure to expedite permits would be a default and require fees during any delay to be waived.

(E).   **The City Contractually Agreed in the Development Agreement that Any Delays for Emergencies (Coronavirus Pandemic) Require Waiver of Fees**.

42.   The Development Agreements provide in Section 23(i) titled "Force Majeure" that "an extension of time" during delays due to "local, state or national emergencies" or delays due "any default by the City" as follows:

> "23(i). Force Majeure. If delays are caused by unforeseen events beyond the control of the Operator, such delays will **entitle Operator to an extension of time** as provided in this section. Such unforeseen events ('Force Majeure') **shall mean** war, insurrection, acts of God, **local, state or national emergencies**, strikes and other labor difficulties beyond the party's control, **or any default by the City** hereunder, which Force Majeure event substantially interferes with the development, construction or operation of the Project."

43.   On March 19, 2020, Governor Newsom ordered all individuals to stay home at their place of residence, except the individuals working in critical infrastructure sectors identified in the order. The order restricted non-essential travel outside the home. On March 19, 2020, the County of Los Angeles issued a Mandatory Stay at Home Order. On March 23, 2020, the City of Cudahy adopted Resolution No. 20-06 which declared a Local Emergency due to the public threat caused by the coronavirus and shut down all non-essential businesses.

44.   The "Force Majeure" clause promised that "local, state or national emergencies" which "substantially interferes with the development, construction or operation of the project," will entitle the Operator to "an extension of time." (Dev. Agmt. § 23(i)). In effect, there are no fees during the period of City caused delays when the Plaintiffs were shut down for 453 days (15 months) from March 19, 2020, when the shelter-in-place orders started, through June 15, 2021, when the it ended. The City did not waive fees during the coronavirus shut down, and its "failure" to "perform any term or provision of this agreement" after a "cure period shall constitute a default." (Dev. Agmt. § 14(a)).

45.     The City contractually agreed that its "failure" to "perform any term or provision of this agreement" after a "cure period shall constitute a default." (Dev. Agmt. § 14(a)). The City also agreed in the "Force Majeure" clause that "**any default by the City**" which "substantially interferes with the development, construction or operation of the project," will entitle the Operators to "an extension of time." (Dev. Agmt. § 23(i)).

46.     In effect, any delay in redesigning approved plan (Dev. Agmt. §§ 1, 3(a)), or in failing to expedite permits (Dev. Agmt. Recital F), or any City caused delays with inspections or construction (Dev. Agmt. § 13) require that fees during this period be waived. The City contractually agreed that any "delay" to "perform" its promises "shall constitute a default." (Dev. Agmt § 14(a)). Therefore, under § 23(i), "**any default by City**" which "substantially interferes" with the project will require a waiver of fees. (Dev. Agmt. § 23(i)). The City's demand for fees during any default by the City is a breach of its contractual promises under § 23(i).

47.     While the Development Agreements allowed the City to charge operating fees, the City unilaterally created a new category of fees, the so called "non-operating fees" which the City accrued monthly while the properties were not open for business. The imposition of these non-operating fees, community benefit fees, and cost recovery fees during the pandemic closure is compounded by the lengthier delays by the Defendants who revised approved plans in breach of the incorporated site and floor plans: "The Operator's site plan and floor plan for the facility are attached hereto as Exhibit D and incorporated into the application." (Dev. Agmt. § 3(a)). The "cannabis permit application" and detailed construction plans were also incorporated. (Dev. Agmt. § 1(d)).

48.     Simply put, the City's delays breached the agreement that the "Operator shall receive priority processing for any corresponding City permits." (Dev. Agmt. Recital F). The City agreed the "project shall vest" (Dev. Agmt. Recital N) and the "Operator may operate cannabis-related activities." (Dev. Agmt. § 4(a)).

(F).     **The City Agreed to Hold Annual Review Hearings For Each Operator, Which Was the Agreed upon Process for the Operators to Present Their Force Majeure Fee Waiver Delay Claims**.

49.     The City contractually agreed in the Development Agreements that "the City Council shall review this agreement annually" to "ascertain Operator's good faith compliance with this agreement." (Dev. Agmt. § 19(a)). At the hearing, the "Operator shall document any request for an extension of the term due to delays beyond the control of Operator (see Dev. Agmt. § 23(i) force majeure)." (Dev. Agmt. § 19(a)). The annual review hearings under § 19(a) incorporated delays under § 23(i), which gave the Plaintiffs a forum to present city-caused delays and closures and receive a waiver of fees for these delays.

50.     However, the City did not hold a single hearing during the 70 months and this preventing any review of City caused delays under Dev. Agmt. §§14(a), 19(a), and 23(i). Despite multiple attempts to meet with Defendants, the Plaintiffs could not "compel [a review] hearing." (Dev. Agmt. § 19(a)).

51.     The City contractually agreed that "no implication will be made to Operator's detriment if a hearing is not in fact held." (Dev. Agmt. § 19(a)). It fell on the City Council to review City caused delays, but no reviews were ever scheduled during the 70-months. The Operators asked to have a meeting with City Council and they were refused.

## ARTICLE II - CITY BREACHED THE DEVELOPMENT AGREEMENTS

(A).     **The City Breached the Development Agreements by Demanding Operating Fees from the Plaintiffs While They Were Not Operating**.

52.     On April 18, 2022, Plaintiffs sent a letter to City Manager Noyola, documenting certain of the delays including the "difficulties in obtaining [permit] approval" the fact that the City switched consultants who restarted the "approval process from the beginning," that "COVID-19 pandemic created further delays," and he asserted that these delays were "Force Majeure-related items and totally out of [the Operators'] control."

53.     City Manager Noyola responded in language repeated in many letters that: "You have provided the City with documentation of disruptions and difficulties with business development and/or operations caused by the COVID-19 pandemic. These difficulties appear to have impacted your business operations for a portion of the time past due fees have accrued."

54.     City Manager Noyola did not comply with the City's contractual promise that the documented force majeure delays entitled the Plaintiffs to waiver of fees. Instead, in concert with other Defendants he placed Plaintiffs in default, and shut down all construction, until they paid all outstanding fees. The demand for fees during the pandemic closure or delays with construction caused by the City is a breach of the City's promises under § 23(I).

55.     Instead of removing fees for City-caused delays, City Manager Noyola used various tactics to extort payment of illegal fees, and put the Plaintiffs "in default status on its Development Agreements until all past due fees . . . have been paid." Placing the Plaintiffs in default status for failing to pay illegal fees prevented any construction work in violation of the Development Agreements. Since the fees are not due, this is a default of the City's promise that any "delay" by the City to "perform" its promises "shall constitute a default." (Dev. Agmt § 14(a)).

56.     On Nov. 15, 2023, the City stated in response to a Public Records Request that the City has billed Plaintiffs a total of $5,404,282 for non-operating fees. In effect, Defendants demanded payment of $5,404,282 in fees from the Plaintiffs and other Operators at a time when none of the Plaintiffs were open for business. Stated differently, the City purposely delayed Plaintiffs from opening and then billed the Plaintiffs for fees for not operating, when Plaintiffs refused to pay the illegal fees, the City moved to find them in default for violating the Development Agreements.

57.     The City's demand for fees during the pandemic closures, fees for redesign delays and construction delays, and non-operating fees violate the Development Agreements.

(B).    **The City Breached the Development Agreements and Violates Plaintiffs Contractual Rights By Contacting State Authorities in Order to Extort Illegal Fees from the Plaintiffs**.

58.    Defendants are leveraging many breaches to secure illegal fees which support claims for individual liability per the Development Agreements permitting "damages from bad faith intentional acts, the grossly negligent or malicious acts of City and its officials, officers, agents, and employees." (Dev. Agmt. § 14(a)).

59.    In April 2022, Defendants hatches a scheme to contact the State of California and inform them that the Plaintiffs were in default to jeopardize their state license.

60.    The City documented ths extortion scheme on April 8, 2022, in a text message from building inspector Louis Morales to City Manager Noyola, noted the Operator, Cuper Development, LLC, owes $600,000 and he is aware of a "request from the State" and had an idea that will "get them to the table now."

> 4/8/2022 1:08:23 PM
>
> Hi Al,
>
> How are you? Happy Friday to you. Please call me at your earliest convenience. I want to run something by you regarding Cuper Development and a request from the State. Cuper Development owes the City around $600k. I think we can get them to the table now. Thanks.
>
> Louis Morales

61.    Upon information and belief, what Plaintiffs did not know at that time is that while they were attempting to open a portion of their facility, the Defendants agreed to proceed on the scheme proposed by Defendant Louis Morales and the City contacted the California Department of Cannabis Control and informed them that the Operators were in default with the City in order to jeopardize renewal of the Operators state permits which meant that Plaintiff Go Cudahy would not be able to open.

62.    Defendants, Louis Morales and Alfonso Noyola, leveraged fear under color of law and fear of economic loss to secure illegal fees from the Operators. The scheme violates the Development Agreements by failing to follow the procedure for default under § 14 for any purported default in refusals to pay illegal fees.

63.     The Operators were blindsided by the City's extortion in securing illegal fees, considering that most of the delays were caused by City. On April 18, 2022, Philip Kfoury, sent a letter to City Manager Noyola, describing the unforeseen delays and the "difficulties in obtaining approval from the City to begin work," that the City's consultants restarted the "approval process from the beginning," that the "pandemic created further delays," and that the City prohibited Plaintiffs them "from continuing work." The letter concluded that these were "Force Majeure-related items and totally out of [Plaintiffs'] control."

64.     On April 22, 2022, Louis Morales texted Alfonso Noyola, that he told the Plaintiffs the "City's position for payment for Cuper Dev. and their provision license issue."



4/22/2022 2:58:30 PM

Hi Al,

How are things going with Phillipe Kfoury? In my follow up phone call with Jon Zimmerman I conveyed the City's position for payment for Cuper Development and their provisional license issue.

65.     On April 22, 2022, Plaintiffs became aware of what the City had done, and sent a letter to Alfonso Noyola, asking him to inform the California Department of Cannabis Control that they are "working towards compliance," and that Plaintiffs did not have the means to make substantial payments as requested.

66.     The letter noted that it has been five years since Plaintiffs started, and that they are still not open, and that City's requested payments are too high for closed businesses to bear at this time. The City understood this position as its economic development strategic plan for 2023 noted that "rising industry taxes has led to cannabis-based businesses shutting down to diminishing profit margins...."

67.     On May 2, 2022, City Manager Noyola, sent a letter stating that the Plaintiffs "shall remain in default status under its Development Agreements until all past due fees are paid in full," which meant that Plaintiff Go Cudahy, would not able to open.

68.     On May 26, 2022, Plaintiffs asked Alfonso Noyola once again to inform the State that "Local Compliance is underway" and for further dialogue with the City on the fees. The letter noted that the "The Operators were unable to move forward with the projects because of various delays outside of anyone's control."

(C).  **The City's Scheme to Extort Illegal Fees by Issuing Temporary 90-Day Permits, Which is Renewed Only if the Plaintiffs are Current on Paying Disputed Fees Violates the Development Agreements**.

69.     In addition to threatening Plaintiffs by contacting the State Department of Cannabis Control, the City unlawfully leveraged the Plaintiffs' right to a full building permit by only providing temporary 90-day occupancy permits and requiring the Plaintiffs to return to the City for permits every 90 days, to ensure they are current on paying disputed fees. This scheme violates many promises by the City in the Development Agreements.

70.     On May 2, 2022, City Manager Noyola, sent a letter stating that the Plaintiffs need a certificate of occupancy to open and "the City will only issue a temporary certificate of occupancy" valid for 90 days, but the temporary permits are renewed if the Plaintiffs are current with their fees:

> Operator may not commence operations within the facility unless and until a valid temporary or permanent certificate of occupancy is issued for the Site. In its decision for issuance of a certificate of occupancy for the Site, the City may take into account the Operator's compliance or non-compliance with the terms of this Letter Agreement. While in "**default status**," the City will only issue a temporary certificate of occupancy (a "TCO") for the Site valid for 90 days. A TCO may be reissued if the Operator remains in compliance with the terms of this Letter Agreement.

71.     On October 18, 2022, Alfonso Noyola stated in a letter to Plaintiffs admitting that Plaintiffs provided documentation of delays caused by the pandemic which impacted accrued fees.

> In our discussions, you have provided the City with information and documentation of disruptions and difficulties with business development and/or operations caused by the COVID19 pandemic. These difficulties appear to have impacted your business operations for a portion of the time past due fees have accrued.

72.     However, instead of waiving fees for City-caused delays, pursuant to § 23(i), Alfonso Noyola put the Plaintiffs in default status until all past due fees have been paid. This prevented the Plaintiffs from continuing construction for the simple act of refusing to pay illegal fees in violation of § 14(a), § 19(a), and § 23(i). § 4(a)).

Page 15

73.     The October letter from Alfonso Noyola reiterated that City's position: "**While in default status**, the City will only issue a temporary certificate of occupancy for the site valid for 90 days. A temporary certificate of occupancy may be reissued if the Operator remains in compliance."

> Site. While in "**default status**," the City will only issue a temporary certificate of occupancy (a "TCO") for the Site valid for 90 days.  A TCO may be reissued if the Operator remains in compliance with the terms of this Letter Agreement.

74.     It is noted that the City seeks payment of fees by providing a temporary occupancy permit for a mere 90 days. However, the Development Agreements do not provide for temporary occupancy permits. The City contractually agreed that the "project shall vest" (Dev. Agmt. Recital N) and that the "Operator may operate cannabis-related activities." (Dev. Agmt. § 4(a)).

75.     In fact, there is no authority in the Development Agreements for the default status or for the temporary occupancy permits. If an Operator is in default (which Plaintiffs are not) the City can deny a building permit: "No building permit shall be issued or building permit application accepted for any structure on the property after City determines the Operator to be in default of the terms and conditions of this Agreement until such default thereafter is cured by Operator or is waived by City." (Dev. Agmt. § 14(f)). Since the Operators were not in default, the "failure" for the City to "perform any term or provision of this Agreement beyond" a "cure period shall constitute a default." (*Id*. § 14(a)).

(D).    **Immediately after Plaintiffs Finally Were Able to Open Go Cudahy, the City Further Schemed to Extort Plaintiffs By Demanding $200,000 in Illegal Fees or Else Face Immediate Revocation**.

76.     On Sept. 6, 2023, Alfonso Noyola demanded in a text message that Go Cudahy make an "immediate payment of $200,000" for overdue non-operating fees, allowing three days to pay, or the Operator would be placed in default and face immediate revocation.

Page 16



77.   Defendant Alfonso Noyola's astounding demand seeking "an immediate payment of $200,000" by City Manager Alfonso Noyola in a text message, is an astounding example of extortion under the color of official right (by the City Manager) and extortion under fear of economic loss (threatening immediate revocation after spending $10 million).

78.   This is especially so when the $200,000 was not due since Defendant Alfonso Noyola stated that in a prior letter that he agreed the "disruptions and difficulties with business development and/or operations caused by the pandemic impacted your business operations for a portion of the time past due fees have accrued." The $200,000 payment was a fee that should have been exempted from collection by the force majeure clause in the Development Agreements. Hence, the text demand violated the Development Agreement. See Dev. Agmt. § 14(a), § 19(a) and § 23(i).

79.   On Oct. 17, 2023, a letter from Plaintiffs to the City sought a hearing before the City Council. On Oct. 24, 2023, city attorney Paloma Perez-McEvoy responded: "The City Council considered your . . . Demand and has decided not to negotiate the repayment of fees and to continue with the administrative process," by which the City meant that it would proceed with revoking Plaintiffs' Development Agreements and licenses to operate.

<u>**Consideration of the October 17 Demand and Administrative Process**</u>

    Please be advised that the City Council considered your October 17 Demand and has decided not to negotiate the repayment of fees and to continue with the administrative process.

(E).     **The City Breached the Development Agreements by Placing Operators in Default and by Issuing 90-Day Occupancy Permits, Without a Hearing**.

80.     City Manager Noyola stated in many letters that the Plaintiffs "will remain in default status on their Development Agreements until all past due fees have been paid" and once the fees are paid "the City will only issue a temporary certificate of occupancy for the site valid for 90 days. The temporary certificate of occupancy may be reissued if the Operator remains in compliance" with the fees.

81.     In addition to placing the Plaintiffs in default status the City red tagged the building to ensure that the Plaintiffs would not be able to perform any construction work at the facilities. The default status, called a red tag by the City, prevented any construction work for failing to pay illegal fees and violated the Development Agreements.

82.     The Development Agreements have no discussion about issuance of a "temporary occupancy permit." On the contrary the Agreements "vest certain rights in the Operator." (Dev. Agmt. Recital B). "The City agrees the Operator's land use entitlements for the project shall vest" (Dev. Agmt Recital N). The "property may be used for commercial cannabis" cultivation, manufacturing, and distribution. (Dev. Agmt. § 1(c)).

83.     The Plaintiffs are not in default for refusing to pay illegal fees. In failing to set annual review hearings, the City denied the Plaintiffs a forum to present force majeure delays. The City contractually promised, in the Development Agreements, that the Plaintiffs could not "compel such hearing, and no implication will be made to Operator's detriment if a hearing is not in fact held." (Dev. Agmt. § 19(a)). However, City staff prevented a hearing before the City Council, and this allowed City staff to push illegal fees without review, and the City Council refused to hold any hearings during the 70-months.

84.     The Plaintiffs are in their 70th month in attempting to open. Building permits were issued years ago, and the permits vested. Since the Plaintiffs are not seeking building permits, denying them the right to proceed with construction for already issued building permits, is a violation of the Development Agreements.

85.     The City promised in the Development Agreements, that it may "modify this Agreement (except no modification shall increase Operators' liability nor reduce Operators' rights)." (Dev. Agmt. § 19). Denying construction for refusing to pay illegal fees is a breach of the Development Agreements because it reduced the Operators' rights.

86.     The Plaintiffs are private business owners, they have rights, more importantly, their rights are agreed upon in the contract with the City. The attempt by Defendants to limit occupancy to ensure payment of illegal fees is a breach of its contractual promises.

(F).    **The City Breached Agreements by Refusing to Waive Fees During the 15 Month Pandemic Closure in Violation of § 23(i)**.

87.     The Development Agreements provide that "unforeseen events," including "local, state or national emergencies" which "substantially interfere with" the project "will entitle the Operators to an extension of time" (Dev. Agmt. § 23(i)).

88.     The Plaintiffs were shut down for 453 days (15 months), from March 19, 2020, when the shelter-in-place orders started (Executive Order N-33-20), through June 15, 2021, when they ended (Executive Order N-07-21). The City demanded fees during the time that the City was closed due to the pandemic. The City's demand for fees during the pandemic closure is a breach of the City's contractual promise under section 23(i).

(G).    **The City Breached Agreement by Seeking Fees During City Caused Delays**.

89.     The City caused delays in redesigning the approved plans (Dev. Agmt. §§ 1, 3(a)), failing to expedite permits (Dev. Agmt. Recital F), seeking electrical upgrades, and causing delays with inspections and construction (Dev. Agmt. § 13), all of which are breaches of the City's contractual promise that any "delay" to "perform" its promises "shall constitute a default." (*Id*.§ 14(a)).

90.     The City agreed that "any default by the City" which delayed the project "will entitle the Operators to an extension of time." (Dev. Agmt. § 23(i)). The Plaintiffs were entitled to a waiver of fees for delays by the City and its consultants. Nonetheless, the City demanded fees notwithstanding its many delays. The building is still not open 70 months after signing the Development Agreements, and this is impossible without City delays.

Page 19

1
2
3
4
5
6
7

91.     The only procedure to document these delays was at the annual review hearing where the "Operators shall document any request for an extension of the term due to delays beyond the control of The Operators (see Section 23(j), Force Majeure)." (Dev. Agmt. § 19(a)). "The Operator has no obligation to compel such hearing, and no implication will be made to Operator's detriment if a hearing is not in fact held." (Dev. Agmt. § 19(a)). By failing to hold any annual review hearings during the past 70 months, the City denied the Operators a forum to present City caused delays.

8
9

(H).     **The City Breached Agreements by Demanding Non-Operating Fees**.

10
11

92.     On Nov. 15, 2023, the City stated in response to a Public Records Request that the Plaintiffs have been billed by the City total non-operating fees of $5,404,282.

12
13
14
15
16

93.     The City seeks operating fees from businesses that are not operating. The word "non-operating fees" is not found in the Development Agreements, or the Cudahy Municipal Code ("CMC"). Community benefit fees are provided for in CMC § 5.20.020(16) and cost recovery fees are provided for in CMC § 5.20.070(6), but there is no provision in the Cudahy Municipal Code that Development Agreements include non-operating fees.

17
18
19
20
21
22

94.     However, the Development Agreements provide in § 7(c) titled "Operating Fees" that the Operators pay fees based gross receipts. (Dev. Agmt § 7(c)). However, the Development Agreements only apply "operating fees" to a business that is "operating." The Development Agreements apply "gross receipts" to an Operator that is open and operating. The word non-operating fees, as used by the City in its invoices and letters is not found in the Development Agreements.

23
24
25
26
27

95.     Defendants' position that Operators owe "non-operating fees" is not supported by the Development Agreements, or the Municipal Code. Defendants strategically delayed the Plaintiffs for refusing to pay illegal fees and this supports claims for individual liability for "damages from bad faith intentional acts, the grossly negligent or malicious acts of City and its officials, officers, agents, and employees." (Dev. Agmt. § 14(a)).

28

(I).   **City Breached Agreements by Failing to Hold Yearly Review Hearings**.

96.   Development Agreements Section 19 titled "Periodic Reviews" requires the City to hold yearly review hearings to determine the Plaintiffs' compliance with the agreement, and for the Operator to document any force majeure delays allowing an extension for delays beyond the control of The Plaintiffs control, as follows:

> "19(a). **City Council shall review this Agreement annually**, on or before each anniversary of the effective date, in order to ascertain Operator's good faith compliance with this agreement . . . planning department will schedule a hearing on the periodic review of the Development Agreements on or following the anniversary of the effective date, but the Operator has no obligation to compel such hearing, and no implication will be made to Operator's detriment if a hearing is not in fact held. The Operator shall document any request for an extension of the term due to delays beyond the control of the Operator (see Section 23(i), "Force Majeure")."

97.   The fundamental purpose of Section 19 was for the City to review Plaintiffs' compliance, but also for the Plaintiffs to demonstrate force majeure delays by the City under § 23(i) which provided that "local, state or national emergencies" or "any default by the City" which delayed the project "will entitle the Operators to an extension of time."

98.   The Development Agreements provide that "the City Council **shall review this agreement annually**, on or before each anniversary of the effective date, in order to ascertain Operator's good faith compliance with this agreement." (Dev. Agmt. § 19(a)).

99.   The Cudahy Municipal Code provides for "periodic review of an applicant's compliance with the terms of the Development Agreements **at least once every 12 months**." (CMC § 20.84.600). State law similarly requires "periodic review **at least every 12 months**" to "demonstrate good faith compliance." (Gov. Code § 65865.1).

100.   However, during the 70 months since the Development Agreements were signed, the City Council did not review the agreements in violation of the Development Agreements, Cudahy Municipal Code and Gov. Code § 65865.1.

101.    This is important because under Section 19, the "the Operator has no obligation to compel such hearing, and no implication will be made to Operator's detriment if a hearing is not in fact held." (Dev. Agmt. § 19(a)). The City's failure to hold yearly review hearings would have allowed the Plaintiffs to address force majeure delays many years ago.

102.    The first review was required 57 months ago, the second 45 months ago, the third review 33 months ago, the fourth review 21 months ago, and the fifth review 9 months ago. This falls on the City which has contractually agreed "no implication will be made to Operator's detriment if a hearing is not in fact held." (Dev. Agmt. § 19(a)).

(J).    **The City Breached the Development Agreements by Setting Review Hearing Before a Hearing Officer Instead of the City Council**.

103.    The Development Agreements provides that "**the City Council shall** review this agreement annually." (Dev. Agmt. § 19(a)). State laws require a "review **at least every 12 months**" before the local agency. (Gov. Code § 65865.1). Notwithstanding this clear contractual demand, defendant Alfonso Noyola in a scheme to extort illegal fees, ordered defendant Madrigal-Gonzalez to send out notice of hearing before City Manager Noyola's appointed "hearing officer" to determine compliance with "Section 19 of the agreement" to allow the Operators to demonstrate their "good faith compliance."

104.    The handpicked hearing officer -- who has a public record of not supporting cannabis businesses -- is not the City Council, and the notice of hearings violates the Development Agreements, and Gov. Code § 65865.1.

105.    On October 17, 2023 attorney Daffodil Tyminski, sent a letter to the City asking to appear before the City Counsel stating "only City Council can resolve this dispute."

106.    On Oct. 24, 2023, City attorney Paloma McEvoy responded: "Please be advised that the City Council considered [attorney Daffodil Tyminski] October 17 demand [to appear before City Council] and has decided not to negotiate the repayment of fees and to continue with" the revocation hearings. Seldom is breach so openly stated in a letter. Defendants overlook their contractual promise that they "shall cooperate" with the Plaintiffs and

"undertake such reasonable actions as may be appropriate to ensure this Agreement remains in full force and effect." (Dev. Agmt. § 23(c)).

107.    On December 14, 2023, the Plaintiffs' counsel, Sebastian Rucci, emailed defendant Madrigal-Gonzalez that he "wished to present the Operator's position [at the review hearing], preferably at a hearing before the city council."

(K).    **City Received and Rejected the Notice to Cure its Breach of the Development Agreements and Rejected the Claim for Damages (Gov. Code §§ 905, 945.4)**.

108.    The Development Agreements provide that the "party alleging [a] default or breach shall give the other party not less than thirty-day notice in writing specifying the nature of the alleged default and the manner in which said default may be satisfactorily cured during any such thirty day period . . ." (Dev. Agmt. § 14(a)).

109.    "Subject to extensions of time by mutual consent in writing, **failure to delay by either party** to perform any term or provision of this Agreement beyond a reasonable notice and **cure period shall constitute a default**." (Dev. Agmt. § 14(a)). "After notice and expiration of the 30-day period" the Plaintiffs, party sending the notice "may institute legal proceedings." (Dev. Agmt. § 14(a)).

110.    On January 5, 2024, the Plaintiffs emailed Defendants, and their legal representatives, a 36-page Notice to Cure its Breach of the Development Agreements. **EXHIBIT 2** is a true and accurate copy of the 30-day Notice to Cure.

111.    The Notice identified specific breaches and explained that these breaches would support a claim for damages of $26.4 million. The Notice gave the City 30 days to cure and offered "to discuss the contents of this Notice, or make a full presentation before the City Council, or meet with City officials or City representatives."

112.    The Plaintiffs agreed that they would pay the operating fees once they are operating and they agreed to pay community benefit fees and cost recovery fees. Nothing in this Notice modifies the Development Agreements, the Plaintiffs are interpreting their contractual promise exactly as they signed it.

113.    Neither the City, the Defendants, nor their legal representatives, responded to the Notice. They did not ask for an extension, nor did they agree to work in good faith to cure the patent breaches. Instead, actions from Defendant Alfonso Noyola confirmed that the Defendants intended to continue violate the Development Agreements.

114.    "After notice and expiration of the thirty-day period" the Plaintiffs are "institut[ing] legal proceedings." (Dev. Agmt. § 14(a)). Breach of the Development Agreements is established by (1) the existence of the Development Agreements; (2) the Plaintiffs' performance or excuse for nonperformance; (3) the City of Cudahy's breach; and (4) damage to the Plaintiffs as a result of the City of Cudahy's breach.

115.    Under the Development Agreements, the Plaintiffs may "pursue any remedy at law or equity available for the breach of any provision" of the agreement including pursuing "damages from bad faith intentional acts, the grossly negligent or malicious acts of City and its officials, officers, agents, and employees." (Dev. Agmt. § 14(a)).

116.    Under Gov. Code § 905, "claims for money or damages against local public entities" shall be presented to the City as a condition of filing a lawsuit. Gov. Code § 945.4 provides "no suit for money or damages may be brought against a public entity . . . until a written claim has been presented to the public entity and has been acted upon by the board, or has been deemed to have been rejected by the board."

117.    The Notice identified specific breaches and explained that these breaches would support a claim for lost profits and gave the City "notice that the lost profits from for its breach of the Development Agreements are conservatively estimated at $26.4 million."

118.    The Development Agreements were executed by the City on June 5, 2018, and while Defendants were not in office, nor employees, at that time, the City's contractual promises "shall survive beyond the terms of the present Council members, that this Agreement will serve to bind the City and future Councils to the obligations hereby undertaken." (Dev. Agmt. Recital M).

119.   Defendants expressly repudiated the Development Agreements in writing. Defendants took action to revoke the Development Agreements, but contractually agreed they would "ensure this agreement remains in full force and effect." (Dev. Agmt. § 23(c)).

120.   Defendant's actions directly undermine the City's contractual promises in the Development Agreements and Defendants were given notice that the damages are conservatively estimated at $26.4 million which they rejected with their silence.

121.   On February 5, 2024, the Plaintiffs emailed Defendants, and their legal representatives, a 6-page letter confirming that the 30-day cure period had lapsed in an effort to determine if they intended to comply. **EXHIBIT 3** is an accurate copy of that letter.

122.   Neither the City, nor any Defendant, nor their legal representatives responded to the claim for damages nor sought additional time to cure. Instead, the City undertook actions that confirmed its intention to retaliate.

123.   The Notice informed the Defendants Alfonso Noyola, Martin Fuentes, Cynthia Gonzalez, Daisy Lomeli, Elizabeth Alcantar, Joshua Calhoun, Cecilia Madrigal-Gonzalez and Louis Morales claims against them for individual liability and neither they, nor their legal representatives, responded to the claims against them.

### ARTICLE III- INDIVIDUAL LIABILITY UNDER CIVIL RICO

124.   The Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-68, makes it unlawful for "any person employed by or associated" with any Civil RICO enterprise to "conduct or participate, directly or indirectly" in the RICO enterprise's affairs through a pattern of racketeering activity (18 U.S.C. § 1962(c)).

125.   Civil RICO liability requires the existence of an "enterprise" through which the illegal conduct occurs. An "enterprise" is defined broadly under RICO as "any individual, partnership, corporation, association, or other legal entity." 18 U.S.C. § 1961(4). "Government entity may constitute an enterprise within the meaning of RICO." (*United States v. Freeman* (9th Cir. 1993) 6 F.3d 586, 596-97.)

1    126.    18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through

2    a pattern of racketeering activity. The definitional section of RICO defines "enterprise" as

3    "any individual, partnership, corporation, or other legal entity." 18 U.S.C. 1961(4).

4    127.    The City of Cudahy is engaged in many commercial ventures, and purchases

5    on a regular basis a substantial quantity of local equipment and supplies that are

6    manufactured out-of-state. The City of Cudahy also makes direct out-of-state purchases of

7    supplies, materials, equipment and vehicles. The City of Cudahy is involved in many

8    laudable governmental functions. However, it is also the vehicle through which the pattern

9    of racketeering activity (extortion of illegal fees) is committed. The City of Cudahy is also

10   the direct or indirect beneficiary (unlawful fees) of the racketeering activity.

11   128.    The City of Cudahy is an enterprise affecting interstate commerce within the

12   meaning of RICO ("RICO Enterprise"). The City of Cudahy is the RICO enterprise, it is not

13   a defendant in the Civil RICO count, and damages are not sought against the City of Cudahy

14   under the Civil RICO counts.

15   129.    The RICO Defendants consist of Alfonso Noyola, Elizabeth Alcantar, Martin

16   Fuentes, Cynthia Gonzalez, Daisy Lomeli, Joshua Calhoun, Cecilia Madrigal-Gonzalez, and

17   Louis Morales ("**RICO Defendants**").

18   130.    The RICO Defendants are officials, officers, and employees of the City of

19   Cudahy who conducted the City of Cudahy's affairs "within the scope, or beyond the scope"

20   of authority (*Cedric Kushner v. King* (2001) 533 U.S. 158, 166) and "participated in the

21   operation or management" of the enterprise's affairs. (*Reves v. Ernst & Young* (1993) 507

22   U.S. 170, 185.)

23   131.    Civil RICO prohibits conducting the affairs of an enterprise, the City of

24   Cudahy, through a pattern of racketeering activity. (18 U.S.C. § 1961(5)). "Racketeering

25   activity" is defined in 18 U.S.C. § 1961(1)(B) to include a slew of federal crimes, including

26   extortion in violation of federal law (18 U.S.C. § 1951), violation of federal mail fraud (18

27   U.S.C. § 1341) and violation of federal wire fraud (18 U.S.C. § 1343).

28

(A).     **Extortion Of Disputed Fees under Color of Official Right**.

132.     18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. The definitional section of RICO provides that extortion in violation of federal law, 18 U.S.C. § 1951, is "racketeering activity" and considered a RICO violation. 18 U.S.C. § 1961(1)(B).

133.     The federal crime of extortion is broadly defined by 18 U.S.C. § 1951(b)(2) to mean "the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right." The RICO Defendants committed extortion under both, color of official right, and wrongful use of fear of economic harm.

134.     Extortion under color of official right is a RICO offence which can only be committed by municipal officials in the context of the work of a municipal agency. Extortion under color of official right is when a public official, obtains (or attempts or conspires to obtain) property not due his office from another person with his consent. The use of force, threats or fear is not required for extortion under color of official right, it is implied from the public officials position of authority over the victim.

135.     The RICO Defendants used fear of economic loss to obtain illegal fees to which they had no lawful claim. This was regularly engaged in by the RICO Defendants and regarded as routine. The RICO Defendants' threats of economic loss were veiled threats made by suggestion, implication and inference. The RICO Defendants' exploitation of fear of economic harm worked on Plaintiffs concern about economic harm.

136.     The RICO Defendants made delay their well-honed tactical weapon and they were fully aware that the Plaintiffs would fear the threat of economic loss that comes from the delay. The RICO Defendants used the threat of delay for many years that they widely regarded it as routine.

137.     The Plaintiffs reasonably believed that the RICO Defendants had the power to harm them economically and that the RICO Defendants would exploit that power.

138.    The Plaintiffs realized that after spending approximately $10 million any vindication of their rights meant they would never open. This put them in fear of economic harm and possible bankruptcy. Considering all the circumstances a reasonable person in the same situation as the Plaintiffs would have perceived a real fear of economic harm and possible bankruptcy, if they did not go along with the RICO Defendants' unlawful demands.

139.    During the 70-month delay, Cudahy officials, officers, and employees demanded the Plaintiffs pay the disputed fees, and in return, withheld permits, unless the disputed fees were paid. Cudahy officials, officers, employees, and consultants, imposed endless changes in violation of the City's contractual promises 70 months earlier.

140.    The strategic delays forced the Plaintiffs to undergo a five-year procedural gauntlet of ever-changing revisions and inspection criteria. The changes were fraught with delays and uncertainty. Civil RICO has been approved repeatedly for garden variety fraud and breach of contract claims. (*Sedima v. Imrex* (1985) 473 U.S. 479.)

141.    Four years into the project, Cudahy officials, officers, and employees stepped up their demands regarding fees, shortly after City Manager Noyola was hired, and during his tenure, the RICO Defendants placed the projects in default for not paying the illegal fees.

142.    The RICO Defendants contacted the California Department of Cannabis Control and informed them the Plaintiffs were not compliant because their fees were outstanding. In turn, the State informed the Plaintiffs their permit would not be renewed unless the issue with the City was resolved.

143.    The RICO Defendants offered to remove the default status if the Plaintiffs paid all outstanding and disputed fees. After this did not produce payment of the disputed fees, the RICO Defendants initiated revocation proceedings and offered to allow the facility to open if they paid all the disputed fees due.

144.    The RICO Defendants' actions constitute extortion under the color of official right and constitute extortion under fear of economic loss, in violation of 18 U.S.C. § 1951.

145.    After spending more than $10 million over five years, only one of seven facilities is open and only because it agreed to pay disputed fees under fear of economic

harm. Defendant Alfonso Noyola's offered of a 90-day temporary occupancy permit in return for payment of disputed fees.

146.    Because City Manager Noyola sought fees under his official role as City Manager, these acts are also extortion by obtaining fees with consent "under color of official right." (18 U.S.C. § 1951(b)(2).)

147.    The offer to pay disputed fees is also extortion by obtaining property from another, with his consent, induced by fear. The "term 'fear' may be of economic loss." (*Brokerage Concepts v. U.S. Healthcare* (3d Cir. 1998) 140 F.3d 494, 503).

148.    The RICO Defendants' retaliation included placing the Plaintiffs in default, and by initiating defective revocation hearings, and only agreeing to halt the illegal revocations if Defendants paid disputed and illegal fees constitutes extortion under color of official right and extortion under fear of economic loss in violation of 18 U.S.C. § 1951.

149.    The scheme to exact unlawful fees, identified in the text message by Defendants Morales and Noyola, seeks to secure payment of disputed fees, by informing the California Department of Cannabis Control that the Plaintiffs are in default, and as the text message shows this was set in motion to "get them to the table now." The demand by RICO Defendant Alfonso Noyola in his text demanding $200,000 for overdue fees is extortion under threat of economic harm, and extortion under color of official right. These demands are unlawful and extortion in violation of 18 U.S.C. § 1951.

(B).    **Mail, Wire, and Telephone Used in Scheme to Defraud**.

150.    Civil RICO includes violation of federal mail and wire fraud (18 U.S.C. §§ 1341, 1343) as predicates that constitute racketeering activity. See 18 U.S.C. § 1961(1)(B).

151.    The mail fraud statute prohibits the use of the mail to execute any "scheme or artifice to defraud." 18 U.S.C. § 1341. "Innocent mailings -- ones that contain no false information-- may" supply the mail element even if mailing is routine. (*Sedima v. Imrex* (1985) 473 U.S. 479, 715.) The Supreme Court approved mail and wire fraud for "presenting inflated bills, cheating [plaintiff] out of a portion of its proceeds by collecting for non-

existent expenses." (*Sedima v. Imrex* (1985) 473 U.S. 479, 484). Cudahy officials submitted countless invoices seeking illegal fees, these invoices also inflated fees due.

152.    The RICO Defendants committed many acts of mail and wire fraud, by demanding disputed fees, and offering 90-day conditional approvals if the fees were current.

153.    The RICO Defendants used retaliation to advance their scheme to exact unlawful fees from the Plaintiffs. The scheme was intended to defraud the Plaintiffs of their money and involved calculated efforts of abusive power to induce the Plaintiffs to give up their money, or face delay, retaliation and possible bankruptcy. During the past 70 months the RICO Defendants submitted countless documents by mail, and by email, sufficient to support mail and wire fraud. **EXHIBIT 4** is a true and accurate copy of letters, invoices and emails sent by the RICO Defendants. Exhibit 4 includes the following letter and emails supporting the claims of Extortion, and Mail & Wire Fraud

- 2022 INVOICES, LETTERS AND EMAILS
  - (1).    04-18-22 Philip Kfoury Letter to City Manager Noyola on Outstanding Fees
  - (2).    04-22-22 Philip Kfoury Letter to City Manager Noyola on Outstanding Fees
  - (3).    05-02-22 City Manager Noyola Letter seeking illegal fees (Cuper Dev)
  - (4).    05-02-22 City Manager Noyola Letter seeking illegal fees (Go Cudahy)
  - (5).    05-06-22 Philip Kfoury Letter to City Manager Noyola Defer Fees
  - (6).    05-26-22 Phillip Kofury letter to City on illegal fees
  - (7).    07-06-22 Philip Kfoury Letter to Noyola Hiring Hernandez as consultant
  - (8).    09-28-22 Cannabis State License for Go Cudahy
  - (9).    10-18-22 Finance Director Calhoun letter Demanding Illegal Fees
  - (10).   12-07-22 Finance Director Calhoun letter Demanding Illegal Fees
- 2023 INVOICES, LETTERS AND EMAILS
  - (11).   01-10-23 City Manager Noyola letter on deferred payment
  - (12).   02-22-23 City Email Informing State of Compliance
  - (13).   03-02-23 City Email Regarding Demaing Illegal Fees
  - (14).   03-09-23 Letter to the City stating that Go Cudahy commenced operations

(15).   04-03-23 Finance Director Calhoon emailing Wire Transfer Inst

(16).   04-04-23 Finance Director Calhoun letter Demanding Illegal Fees

(17).   05-31-23 Planner Madrigal-Gonzalez Final Demand Letter (Davina LLC)

(18).   06-07-23 Email Go Cudahy Illegal Temp Occupancy is Expiring

(19).   06-08-23 City email Seeking State Certification

(20).   06-23-23 Senior Planner Madrigal-Gonzalez Final Demand Letter

(21).   07-14-23 Tyminski Letter to City Attorney Vic Ponto Potential Litigation

(22).   08-09-23 Finance Director Calhoun letter misquoting Deve Agmt

(23).   08-10-23 City Attorney Perez-McEvoy Response to Tyminski Demand

(24).   08-15-23 Tyminski Letter to City Illegal Fees

(25).   10-02-23 Email to Finance Director Calhoun Paying Illegal Fees

(26).   10-02-23 Email to Raul Diaz on Temp Occupancy Permit

(27).   10-07-23 Raul Diaz email on Renewing Temporary Occupancy

(28).   10-10-23 City Attorney Paloma McEvoy letter Regarding Illegal Fees

(29).   10-12-23 Planner Madrigal-Gonzalez Notice of Revocation Hearing

(30).   10-18-23 Raul Diaz email on Building Permit Requirements

(31).   10-18-23 Raul Diaz letter on Building Permit Requirements

(32).   10-24-23 City Attorney Paloma McEvoy letter Regarding Fee Audit

(33).   10-24-23 Finance Director Calhoun letter Demanding Illegal Fees

(34).   10-30-23 City Attorney Paloma McEvoy letter Regarding Fee Audit

(35).   11-08-23 City email of Illegal Temporary License

(36).   11-15-23 City Attorney McEvoy confirming $5.4 Million No-Operating Fees

(37).   11-15-23 Finance Director Calhoun letter Demanding Illegal Fees

(38).   11-20-23 Staff Report to Repeal Development Agreement (420 LLC)

(39).   11-27-23 Madrigal-Gonzalez Notice of Illegal Hearing with Hearing Officer

(40).   12-05-23 Finance Director Calhoun Letter Notice to terminate Deve Agmt

(41).   12-13-23 Finance Director Calhoun letter Received Payment of Illegal Fees

(42).   12-15-23 Finance Director Calhoun letter Demanding Illegal Fees

(43).   12-29-23 Senior Planner Madrigal-Gonzalez Denying Appearance at Hearin

● 2024 INVOICES, LETTERS AND EMAILS

(44).   01-22-24 Finance Director Calhoun letter demanding illegal fees

(45).   02-01-24 City Manager Noyola letter Revoke Temporary Occupancy Permit

(46).   02-12-24 Finance Director Calhoun email demanding illegal fees

(47).   02-12-24 Finance Director Calhoun letter demanding illegal fees

(C).   **Actions by Individuals Supports a Pattern of Racketeering Activity**.

154.   The above letters, invoices and emails in EXHIBIT 4 confirm that the Defendants were seeking illegal fees, and were aware of the extortion and their breach of the Development Agreements, City Municipal Code and State Law.

155.   18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a "pattern of racketeering activity" which is defined as "at least two acts of racketeering activity" within ten years. 18 U.S.C. § 1961(5). Extortion in violation of 18 U.S.C. § 1951 extortion in violation of 18 U.S.C. § 1951, mail fraud in violation of 18 U.S.C. § 1341, wire fraud in violation of 18 U.S.C. § 1343, and any act involving extortion chargeable under state law. 18 U.S.C. § 1961(1)(A)-(B) is considered "racketeering activity."

156.   The allegation of a pattern of racketeering activity requires at least two acts of racketeering activity within ten years. (18 U.S.C. § 1961(5)). This requires that the "racketeering predicates are related" and they either extended over "a substantial period of time" or "pose a threat of continued criminal activity." (*H.J. Inc. v. North. Bell Tel.* (1989) 492 U.S. 229, 239, 242.) The widespread extortion activity spans more two years, and starting when Defendant Alfonso Noyola was hired as City Manager. He orchestrated the racketeering in an effort to secure illegal fees to shore up the City's budget. The RICO Defendants used extortion to demand unlawful fees and committed many acts of extortion under color of official right, and under threat of economic harm.

157.   Besides the "multiple extortionate acts against the seven Plaintiffs, there are many episodes of extortion against other Plaintiffs under similar circumstances. Some of whom have already been forced out of business.

158.    The RICO Defendants' predicate acts of extortion relate to the scheme to take unlawful fees, or face delay, denial, retaliation or possible bankruptcy, and the predicate acts of mail and wire fraud are related to the scheme to take unlawful exactions, or face delay, denial, or retaliation. The extortion is widespread and spans five years. The extortion against the Plaintiffs spans seven separate entities over a 70 month period.

159.    The RICO Defendants have no intention of stopping the racketeering activity which "by its nature project[ed] into the future with a threat of repetition,' thus satisfying RICO's pattern requirement." (*H.J. Inc. v. North. Bell Tel.* (1989) 492 U.S. 229, at 241.)

(D).    **Defendants Engaged in a Civil RICO Conspiracy**.

160.    The RICO conspiracy statute, § 1962(d), makes it "unlawful for any person to conspire to violate" § 1962(c). The conspirators "may divide up the work, yet each is responsible for the acts of each other." (*Salinas v. U.S.* (1997) 522 U.S. 52 at 63-64). "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." (*Id.* at 64).

161.    The RICO conspiracy statute, 18 U.S.C. § 1962(d), makes it "unlawful for any person to conspire to violate" § 1962(c). Therefore, under § 1962(d) it is unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity. In *Salinas v. U.S.*, 522 U.S. 52 (1997) the Supreme Court held that there "is no requirement of some overt act or specific act" in § 1962(d). (*Salinas*, 522 U.S. at 63.)

162.    A "conspiracy may exist even if a conspirator does not agree to commit or facilitate each and every part of the substantive offense." (*Salinas*, 522 U.S. at 63). The conspirators "may divide up the work, yet each is responsible for the acts of each other." (*Salinas*, 522 U.S. at 63-64.) "If conspirators have a plan which calls for some conspirators to perpetrate the crime and others to provide support, the supporters are as guilty as the perpetrators." (*Salinas*, 522 U.S. at 64.)

163.    The RICO Defendants conspired and agreed with each other to engage in the conduct stated, they conspired and agreed to aid each other in the commission of the acts of

extortion, or of an attempt to commit extortion, and agreed to conduct or participate in the affairs of the City and agreed to commit acts of extortion, as their regular way of conducting the City's affairs.

164.    RICO Defendants planned and schemed to use the City as a racketeering enterprise to extort money from the Plaintiffs and conspired to conduct the affairs of the City of Cudahy, the RICO Enterprise, using acts of extortion by demanding illegal fees as a condition of project opening.

165.    RICO Defendants combined, conspired and confederated with each other to commit the racketeering activity, the objectives of the conspiracy is identified herein, and the many meetings between them and the Plaintiffs provide sufficient evidence of the conspiracy, and that they were part of a fraudulent scheme.

(E).    **Civil RICO Claims Support Actions for Damages to Business**.

166.    Each act identified herein by the RICO Defendants was the proximate cause of the lost profits and the "lost business" was foreseeable. In (*Sedima v. Imrex* (1985) 473 U.S. 479 the Supreme Court held that no special "racketeering injury" must be proved for a civil RICO plaintiff to recover beyond the ordinary harm suffered by the victims of the individual predicate crimes. (*Sedima*, 473 U.S. at 495)*.

167.    RICO Defendants engaged in a pattern of racketeering activity which injured the Plaintiffs business, giving the Plaintiffs' claims under 18 U.S.C. § 1964(c) for damages. RICO Defendants engaged in a pattern of racketeering activity that injured the Plaintiffs in their business or property, giving Plaintiffs a claim for damages under 18 U.S.C. § 1964(c).

168.    The proximate cause of the damages for the RICO Defendants' actions is conservatively estimated at $26.4 million, and this sum will trebled to $79.2 million.

//

//

//

**ARTICLE IV- CITY REJECTED POSTING OF BOND FOR DISPUTED FEES**

(A).    **City Rejected Demand to Post a Bond for the Disputed Fees and Proceed under Protest Pursuant to Gov. Code § § 66020, 66021**

169.    Government Code § 66020, provides that the Plaintiffs are permitted to "protest the imposition of any fees, dedications, reservations, or other exactions imposed on a development project" by "providing satisfactory evidence of arrangements to pay the fee when due" and by serving written notice on the City that conditions are imposed (agreement to post a bond) in an effort to "protest" the illegal fees. (Gov Code § 66020(a)).

170.    Under Gov. Code § 66021, the Plaintiffs "on whom a fee . . . or other exaction has been imposed, the payment or performance of which is required to obtain governmental approval of a . . . development project, may protest the establishment or imposition of the fee, tax" as provided in § 66020. (Gov Code § 66021(a)).

171.    Notice was provided (EXHIBIT B) that the Plaintiffs sought to "proceed under protest and seek an arrangement to pay the disputed fees, under protest, by posting a bond, under Gov. Code § 66020."

172.    The Notice stated: The Operators are prepared to bond the fees under protest. This allows them to proceed with construction. The Operators seek documentation of the total fees that the City seeks, and the Plaintiffs agreed to post a bond for this sum. If the Operators disagreed with the City, they stated they would present a claim to the Court for approval.

173.    Surprisingly, the City did not respond to the request to post a bond and did not respond to our request to proceed under protest. This is an option that the City did not have. The City's silence violates the Plaintiffs' rights under Gov. Code §§ 66020, 6602.

174.    If the court finds in favor of the Plaintiffs the "the court shall direct the local agency to refund the unlawful portion of the payment, with interest." (Gov Code § 66020(e)).

175.    If Plaintiffs prevail "the court shall direct the local agency to refund the unlawful portion of the payment, plus interest..." (Cal Gov Code § 66020(f)(1)). The California Supreme Court noted in *Sterling Park v. City Palo Alto* (2013), 57 Cal. 4th 1193:

"Gov Code § 66020(a)(1) permits the protesting party either to pay the amount in full or 'provid[e] satisfactory evidence of arrangements to pay the fee when due … .' Obviously, if the protesting party does the latter, there will be no payment to repay or exaction to return. This does not make section 66020 self-canceling whenever the developer provides the required satisfactory evidence and does not make an actual payment. It just means that a remedy will not include repayment of a payment that was never made." (*Id*. at 1208).

176.   The Plaintiffs stated in their Notice that they were prepared to post, under protest, a bond for the amount of disputed fees. This would have allowed the Plaintiffs to proceed with construction.

177.   The Notice asked for documentation from the City of the fee which the City sought and that the Plaintiffs would post a bond for that sum, and if they disagree with the fee, the will present a fee to the Court for approval. The Development Agreements are clear that the City's contractual promises "shall survive beyond the terms of the present Council members that this Agreement will serve to bind the City and future Councils to the obligations hereby undertaken." (Dev. Agmt. Recital M).

178.   The Notice notified Defendants that "nothing contained [in the Development Agreements] shall modify or abridge the Operator's rights or remedies (including its rights for damages, if any) resulting from bad faith intentional acts, the grossly negligent or malicious acts of the City and its officials, officers, agents, and employees." (Dev. Agmt. § 14(a)).

179.   Under Section 14 of the Development Agreements, the Plaintiffs gave the City notice [EXHIBIT B] of its "default" and "breach" of the agreements, specifying "the nature of the alleged default and the manner in which said default may be satisfactorily cured." (Dev. Agmt. § 14(a)). The City's "failure" to cure within 30 days "shall constitute a default." (*Id*.) "After notice and expiration" of the 30 days to cure, the Plaintiffs "may institute legal proceedings." (*Id*.)

180.    The Plaintiffs made every effort to give the City detailed notice to cure. Having been rebuffed by the City, they are proceeding with litigation. They also provided a detailed claim for damages (Gov. Code §§ 905, 945.4) and the City's silence to the Notice to cure is confirmed by Defendant Alfonso Noyola's February 1, 2024 letter which rejects the damage claims.

181.    On February 1, 2024, the City manager informed the Plaintiffs that he intended to proceed with the retaliation, even after all the violations were identified in great detail. Instead of reaching out to resolve the apparent breaches and damages to the Plaintiffs, who have been waiting 70 months to open after spending $10 million, the City, its officials, and employees have decided to continue retaliating.

182.    The Plaintiffs complied with all the efforts to cure and provided detailed notice of our demand for damages (Gov. Code §§ 905, 945.4) and to proceed under protest by posting a bond of the Illegal fees (Gov. Code § 66020). Efforts to have the City cure its numerous breaches have been unsuccessful. After 70 months, Defendants refused to allow the Plaintiffs to open.

**COUNT 1**
**BREACH OF CONTRACT**

COMES NOW the Plaintiffs and for their complaint for Breach of Contract against defendant the City of Cudahy state as follows:

183.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

184.    Breach of the Development Agreements is established by(1) the existence of the Development Agreements, (2) the Operator's performance, (3) breach by the City of Cudahy, and (4) damage to the Plaintiffs as a result of the City's breach.

185.    Defendants, have demonstrated their intention not to be bound by the Development Agreements. Defendants actively refused to cooperate and actually sought to have the Operator's rights revoked in violation of the Development Agreements.

186.   As a direct and proximate result of the City of Cudahy's actions stated above, a right has accrued to the Plaintiffs for damages in an amount to be determined upon trial of this action, which amount exceeds Twenty Five Million Dollars ($25,000,000).

WHEREFORE, Plaintiffs pray for judgment against the City of Cudahy as follows:

(A).   For damages against the City of Cudahy in an amount to be determined upon trial of this action, which amount which exceeds Twenty Five Million Dollars ($25,000,000);

(B).   For costs of this proceeding and for reasonable attorneys fees, and

(C).   For such other and further relief this court may deem just and proper.

## COUNT 2
## VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

COMES NOW Plaintiffs and for their complaint for violation of 18 U.S.C. § 1962(c) against defendants Alfonso Noyola, Elizabeth Alcantar, Martin Fuentes, Cynthia Gonzalez, and Daisy Lomeli, Joshua Calhoun, Cecilia Madrigal-Gonzalez, Raul Diaz, and Louis Morales (collectively the "RICO Defendants"), each of them individually, jointly and severally (**City of Cudahy is not a defendant in this Count**), state as follows:

187.   The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

188.   City of Cudahy is not a defendant in this cause of action, and damages are not sought from City of Cudahy under this cause of action.

189.   The RICO Defendants are separate, culpable parties who benefitted individually and collectively, either directly or indirectly, from the City of Cudahy's pattern of racketeering activity, namely, extortion under the color of official right over a period of more than fifteen years. Each and every act of the RICO Defendants was motivated by evil intent, or reckless or callous indifference to the rights of the Plaintiffs. Each of the RICO Defendants was in some manner proximately responsible for the events and happenings alleged in this complaint and for the Plaintiffs' injuries and damages.

190.    Each and every act of the RICO Defendants was done for personal gain, self interest and for personal benefit. The RICO Defendants are associated with the City of Cudahy and enjoy on a first hand basis the illegal fees they attempt to extort from Plaintiffs.

191.    Between February 16, 2021 and February 16, 2024 (date this complaint was filed) the RICO Defendants committed acts of racketeering which obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain fees that were not due from the Plaintiffs, under color of official right, in violation of 18 U.S.C. § 1951.

192.    Between February 16, 2021 and February 16, 2024 (date this complaint was filed) , the RICO Defendants committed acts of racketeering when they obstructed, delayed, and affected commerce by extortion, that is, by attempting to obtain fees that were not due from the Plaintiffs, using fear of economic loss, in violation of 18 U.S.C. § 1951.

193.    That RICO Defendants used the mail to communicate with the Plaintiffs over a substantial period of time. Each of the interstate letters used the United State mails in furtherance of their scheme to obtain (or attempt or conspire to obtain) disputed and illegal fees in violation of 18 U.S.C. § 1341 (Mail Fraud).

194.    The RICO Defendants committed many separate acts of mail and wire fraud in furtherance of the extortion scheme in violation of 18 U.S.C. §§ 1341, 1343. The mail or wire communication related to the extortion scheme, and was incident to an essential part of the scheme, and involved many misrepresentations reasonably calculated to deceive a person of ordinary prudence. Each time a letter was sent it deprived, or attempted to deprive, the Plaintiffs of property, and resulted in a distinct injury to the Plaintiffs and a concomitant benefit to the RICO Defendants.

195.    Between February 16, 2021 and February 16, 2024 (date this complaint was filed) , the Defendants committed multiple acts of mail and wire fraud against the Plaintiffs in violation of 18 U.S.C. §§ 1941, 1943.  Each act of mail and wire fraud constitutes separate instances of interrelated racketeering activity.

196.    The RICO Defendants' racketeering activity threatens to continue unabated, driven by the possibility of repeated ability to invest the racketeering income back into the

Page 39

enterprise (City of Cudahy). The acts of mail and wire fraud escalated confirming that the RICO Defendants have no intention of stopping the racketeering activity which by it's very nature is projected into the future with a threat of repetition.

197.    Besides the multiple extortionate acts against the Plaintiffs, there are hundreds of episodes of extortion against other Plaintiffs by the RICO Defendants as this is their regular way of conducting the City of Cudahy's affairs. The extortion activities are widespread and span a period of more than three years.

198.    The pattern of racketeering activities, affected not merely the Plaintiffs, but many others and citizens as a whole. The very scope and persistence of the racketeering poses a special threat to social well-being of every resident of the City of Cudahy which are indirect victims of the racketeering activity. The RICO Defendants' policy of demanding unlawful fees is a pattern of racketeering activity, and unless restrained the practice is likely to continue unabated for years.

199.    The injury to the Plaintiffs' business or property was proximately caused by the Defendants' pattern of racketeering activity. Each act of extortion injured the Plaintiffs' business or property and represents a discrete attempt to extort from the Plaintiffs and had little to do with the previous or subsequent act of extortion.

200.    As a direct and proximate cause of the RICO Defendants actions of extortion and their violations of 18 U.S.C. § 1962(c) the Plaintiffs have been and continue to be injured in their business or property within the meaning of 18 U.S.C. § 1964(c) in an amount to be determined upon trial of this action, which amount exceeds Twenty Five Million Dollars ($25,000,000) and the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

WHEREFORE, Plaintiffs pray for judgment against Alfonso Noyola, Elizabeth Alcantar, Martin Fuentes, Cynthia Gonzalez, and Daisy Lomeli, Joshua Calhoun, Cecilia Madrigal-Gonzalez, Raul Diaz, and Louis Morales, jointly and severally, as follows:

(A).  For damages against Alfonso Noyola, Elizabeth Alcantar, Martin Fuentes, Cynthia Gonzalez, and Daisy Lomeli, Joshua Calhoun, Cecilia Madrigal-Gonzalez, Raul Diaz, and Louis Morales, each of them individually, jointly and severally, in an amount to

be determined upon trial of this action, which amount which exceeds Twenty Five Million Dollars ($25,000,000);

(B). For the above damages duly trebled in accordance with 18 U.S.C. § 1964(c);

(C). For costs of suit including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c);

(D). and For such other and further relief this court may deem just and proper.

**COUNT 3**
**CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)**

COMES NOW Plaintiffs and for their complaint for violation of 18 U.S.C. § 1962(d) against Defendants Alfonso Noyola, Elizabeth Alcantar, Martin Fuentes, Cynthia Gonzalez, and Daisy Lomeli, Joshua Calhoun, Cecilia Madrigal-Gonzalez, Raul Diaz, and Louis Morales (collectively the "RICO Defendants"), each of them individually, each of them individually, jointly and severally (**City of Cudahy is not a defendant in this Count**), state:

201. The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

202. 18 U.S.C. § 1962(c) prohibits conducting the affairs of an enterprise through a pattern of racketeering activity. 18 U.S.C. § 1962(d) makes it "unlawful to conspire to violate [18 U.S.C. § 1962(c)]." Hence, 18 U.S.C. § 1962(d) makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity.

203. The RICO Defendants conspired and agreed with each other to engage in the conduct or attempt conducted stated above, and also conspired and agreed to aid each other in the commission of the acts of extortion, or of an attempt to commit extortion, as stated above. The RICO Defendants conspired, planned and schemed to use the City of Cudahy as a racketeering enterprise to extort money, real property and personal property through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

204. The RICO Defendants agreed to conduct or participate in the affairs of the City of Cudahy and agreed to commit acts of extortion, as their regular way of conducting the

Villages affairs, by demanding unlawful exactions (impact fees, land and improvements) as a condition of development approval, under color of official right.

205.    The RICO Defendants conspired to violate 18 U.S.C. § 1962(c) by conducting the affairs of the City of Cudahy through a pattern of racketeering activity, by committing multiple acts of extortion and retaliation on the Plaintiffs.

206.    Each of the RICO Defendants combined, conspired and confederated with each other to commit a pattern of racketeering activity, and thereby violated 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c).

WHEREFORE, Plaintiffs pray for judgment against Alfonso Noyola, Elizabeth Alcantar, Martin Fuentes, Cynthia Gonzalez, and Daisy Lomeli, Joshua Calhoun, Cecilia Madrigal-Gonzalez, Raul Diaz, and Louis Morales, jointly and severally, as follows:

(A).  For damages against the Alfonso Noyola, Elizabeth Alcantar, Martin Fuentes, Cynthia Gonzalez, and Daisy Lomeli, Joshua Calhoun, Cecilia Madrigal-Gonzalez, Raul Diaz, and Louis Morales, each of them individually, jointly and severally, in an amount to be determined upon trial of this action, which amount which exceeds Twenty Five Million Dollars ($25,000,000);

(B).  For the above damages duly trebled in accordance with 18 U.S.C. § 1964(c);

(C).  For costs of suit including reasonable attorneys fees in accordance with 18 U.S.C. § 1964(c); and For such other and further relief this court may deem just and proper.

**COUNT 4**
**VIOLATION OF EQUAL PROTECTION 42 U.S.C. § 1983**

COMES NOW the Plaintiffs and for their complaint for violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution against defendant the City of Cudahy, state as follows:

207.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

208.    The actions of the City of Cudahy, as alleged above, violate the Plaintiff's rights to equal protection as provided by the Fourteenth Amendment to the United States Constitution, and any violation of the the Fourteenth Amendment is compensable under 42 U.S.C. § 1983 permitting damages for violation of the right of equal protection.

WHEREFORE, Plaintiffs pray for judgment against the City of Cudahy as follows:

(A).  For damages against the City of Cudahy in an amount to be determined upon trial of this action, which amount which exceeds Twenty Five Million Dollars ($25,000,000);

(B).  For costs of suit including reasonable attorneys fees in accordance with 42 U.S.C. § 1988;

(C).  and for such other and further relief this court may deem just and proper.

### COUNT 5
### VIOLATION OF DUE PROCESS 42 U.S.C. § 1983

COMES NOW the Plaintiffs and for their complaint for violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution against defendant the City of Cudahy, state as follows:

209.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

210.    The actions of the City of Cudahy, as alleged above, violate the Plaintiffs' rights to Due Process as provided by the Fourteenth Amendment to the United States Constitution, and any violation of the Fourteenth Amendment is compensable under 42 U.S.C. § 1983 permitting damages for violation of the right of due process.

WHEREFORE, Plaintiffs pray for judgment against the City of Cudahy, as follows:

(A).  For damages against the City of Cudahy in an amount to be determined upon trial of this action, which amount which exceeds Twenty Five Million Dollars ($25,000,000);

(B).  For costs of suit including reasonable attorneys fees in accordance with 42 U.S.C. § 1988;

(C).  and for such other and further relief this court may deem just and proper.

**COUNT 6**
**VIOLATION OF GOVERNMENT CODE § 66020**

COMES NOW the Plaintiffs and for their complaint for breach of the Development Agreements against defendant the City of Cudahy state as follows:

211.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

212.    Pursuant to Gov. Code § 66020, the Plaintiffs sent Notice to Defendants [EXHIBIT B] that they desired to post a bond the disputed fees under protest. This would have allowed them to proceed with construction. Their Notice met the demands of the statute because they agreed to provide "satisfactory evidence of arrangements to pay the fee when due." (Cal Gov Code § 66020, subd. (a)).

213.    After waiting 40 days without a response, it became clear that the City refused to cooperate with the demand to post a bond.

214.    As a direct and proximate result of the City of Cudahy's actions, the Plaintiffs have been damaged in an amount to be determined upon trial of this action, which amount exceeds Twenty Five Million Dollars ($25,000,000).

WHEREFORE, Plaintiffs pray for judgment against the City of Cudahy as follows:

(A).  For damages against the City of Cudahy in an amount to be determined upon trial of this action, which amount which exceeds Twenty Five Million Dollars ($25,000,000);

(B).  For costs of this proceeding and reasonable attorneys fees, and

(C).  For such other and further relief this court may deem just and proper.

**COUNT 7**
**DECLARATORY JUDGMENT (OPERATING FEES ARE ILLEGAL TAX)**

COMES NOW the Plaintiffs and for their complaint for breach of the Development Agreements against defendant the City of Cudahy state as follows:

215.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

216.    The operating and non-operating fee, is not a fee, it is a tax. The City's economic development strategic plan 2023 (Resolution No. 23-41) identified the fees as tax in this passage: "Light industrial processing/warehousing refers to facilities involved in activities such as cultivation, processing, and distribution of cannabis products. These operations may include growing and harvesting plants, manufacturing products like edibles or extracts, and storing inventory. Taxes can be collected through licensing fees, permit fees, and taxes based on the volume or value of products."

217.    The City is correct, the operating fees and non-operating fee are a licensing and permit fee "tax based on the volume." (Resolution No. 23-41). However, the "operating fees" and "non-operating fee" were not approved by the voters in violation of the Government Code: "No local government . . . may impose any general tax unless. . . approved by a majority of the voters voting in an election on the issue." (Gov. Code § 53723.) "No local government may impose any special tax" without a "two-thirds vote of the voters voting in an election on the issue." (Gov. Code § 53722.)

218.    The City was aware that a cannabis tax requires voters approval by submitting the recent retail cannabis tax to the voters for approval and enacted it in Chapter 5.30 after voter approval. Non-operating fees are an illegal taxes because there was no public vote.

219.    Cannabis Retailer Tax: Chapter 3.50 the newly enacted Cannabis Retailer Tax approved by the voters imposes "an annual cannabis retailer tax." (CMC § 3.50.040(1)). The tax is imposed "upon cannabis retailers that engage in business in the city. This cannabis retailer tax is levied based upon business gross receipts." (CMC § 3.50.010(1)). "The tax rate upon the effective date of this chapter shall be 15 percent of the gross receipts derived from the retail sale of adult-use cannabis or adult-use cannabis products." (CMC § 3.50.040(3)(a)).

220.    City Business Tax: The Cudahy Municipal Code provides a tax on businesses in Chapter 5.08 titled "Business License Tax -- Particular Businesses." However, it does not include cannabis business in that list. CMC § 5.04.330 lists the "taxes on businesses other than those described in Chapter 5.08" and requires "a license tax based upon gross annual receipts." If "Gross Annual Receipts" are "$2,000,000 or more" the "Per Annum Fee" is

"$2,000 maximum." The maximum annual fee of $2,000 is far less than the $285,600 yearly fee demanded by the City for the privilege of not being open due to delays by the City.

221.   The "operating fees" and "non-operating fee" were not approved by the voters in violation of the Government Code: "No local government . . . may impose any general tax unless. . . approved by a majority of the voters voting in an election on the issue." (Gov. Code § 53723.) "No local government may impose any special tax" without a "two-thirds vote of the voters voting in an election on the issue." (Gov. Code § 53722.)

222.   The operating fees and non-operating fees are an illegal tax, they were not approved by a public vote in violation of Gov. Code § 53723 and § 53722..

223.   Under the Development Agreements, the Plaintiffs may "pursue any remedy at law or equity available for the breach of any provision." (Dev. Agmt. § 14(a)).

224.   An actual controversy has arisen and now exists between the Plaintiffs and the City of Cudahy relating to their respective rights and duties. The Plaintiffs contend the operating fees and non-operating fees are an illegal tax and seek a judicial determination of their rights and duties. A judicial determination is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

WHEREFORE, the Plaintiffs pray for this Court to enter its declaratory judgment, adjudging, declaring and decreeing judgment against the City of Cudahy, as follows:

(A).  For judgment enjoining and restraining the City, its officers, agents and employees from collecting operating fees, or non-operating fees, from the Plaintiffs.

(B).  For costs of this proceeding, and for such other and further relief this court may deem just and proper.

## COUNT 8

## DECLARATORY JUDGMENT (ILLEGAL IMPACT FEES WITHOUT FINDINGS)

COMES NOW the Plaintiffs and for their complaint for breach of the Development Agreements against defendant the City of Cudahy state as follows:

225.   The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

226.   The Mitigation Fee Act (Gov. Code, § 66000 *et seq*.) limits fees on projects. When a fee is imposed as a condition of approval. Gov. Code § 66001(a) provides procedures to establish fees and requires four findings included that the "reasonable relationship between the fee's use and the type of development project on which the fee is imposed."

227.   Gov. Code § 66006(e) provides that the "improper allocation of development fees hinders economic growth and is, therefore, a matter of statewide interest and concern. It is, therefore, the intent of the Legislature that this section shall supersede all conflicting local laws and shall apply in charter cities."

228.   The non-operating fee/tax are illegal if they are a fee, because the City failed to make the necessary findings to charge the Plaintiffs fees during a period when their business were s closed, mainly due to City delays.

229.   Defendants demand for operating fees and for non-operating fees violates the Development Agreements, it violated the Cudahy Municipal Code (CMC § Chapter 15.40), and it violated the Mitigation Fee Act (Gov. Code, § 66000 *et seq*.)

230.   Defendants demand for operating fees and for non-operating fees violates the Development Agreements, it violated the Cudahy Municipal Code (CMC § Chapter 15.40), and it violated the Mitigation Fee Act (Gov. Code, § 66000 *et seq*.)

231.   Under the Development Agreements, the Plaintiffs may "pursue any remedy at law or equity available for the breach of any provision." (Dev. Agmt. § 14(a)).

232.   An actual controversy has arisen and now exists between the Plaintiffs and the City of Cudahy relating to their respective rights and duties. The Plaintiffs' contend that the operating fees and non-operating fees are an illegal fee, imposed without findings, and seek a judicial determination of their rights and duties. A judicial determination is necessary and appropriate at this time so that the parties may ascertain their respective rights and duties.

WHEREFORE, the Plaintiffs pray for this Court to enter its declaratory judgment, adjudging, declaring and decreeing judgment against the City of Cudahy, as follows:

(A).  For judgment enjoining and restraining the City, its officers, agents and employees from collecting operating fees, or non-operating fees, from the Plaintiffs.

(B).  For costs of this proceeding, and for such other and further relief this court may deem just and proper.

**COUNT 9**
**WRONGFUL USE OF ADMINISTRATIVE PROCEEDINGS**

COMES NOW the Plaintiffs and for their complaint for Wrongful Use of Administrative Proceedings against Defendant the City of Cudahy, state as follows:

233.    The previous paragraphs of this Complaint are incorporated into this cause of action by this reference as though fully set forth herein.

234.    Defendant City of Cudahy wrongfully brought administrative proceeding to revoke Plaintiffs' permits and the Development Agreements.

235.    Defendant City of Cudahy was actively involved in bringing the administrative proceeding.

236.    Defendant City of Cudahy did not conduct an independent investigation, and no reasonable person would under these circumstances have believed that there were reasonable grounds to bring revocation proceeding after receiving the notice to cure letter.

237.    Defendant City of Cudahy acted primarily for a purpose to intimidate Plaintiffs and was certain that there were no merits to its claim for revocation.

238.    Plaintiffs were harmed in an amount to be determined upon trial of this action and Defendant's conduct was a substantial factor in causing Plaintiffs' harm.

WHEREFORE, Plaintiffs pray for judgment against the City of Cudahy, as follows:

(A).  For damages against the City of Cudahy in an amount to be determined upon trial of this action; and

(B).  For costs of this suit including reasonable attorneys fees; and for such other and further relief this court may deem just and proper.

1    PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE

2

3                          LAW OFFICES OF SEBASTIAN RUCCI, P.C.

4

5    Date: April 8, 2024     Sebastian Rucci (SBN 178114)

6                            16400 Pacific Coast Highway, Suite 212

7                            Huntington Beach, CA 92649

                             Tel:   (562) 901-0199
8
                             Cel:   (330) 720-0398
9
                             Fax:  (562) 249-6910
10
                             Sebastian@Rucci.Law
11                           Attorney for Plaintiffs

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**VERIFICATION**

STATE OF CALIFORNIA     )
                               )

COUNTY OF LOS ANGELES   )

       I, Philip Kfoury, declare:

       I am the officer of the principal owner and manager of the six plaintiffs, Cuper Development LLC, Go Cudahy LLC, Davina LLC, Genius Distribution LLC, Daniel and Goliath LLC and Herbal Dragon LLC, attempting to open the manufacturing facilities at 4916 Cecilia Street in the City of Cudahy, California.

       I have read the foregoing Verified Complaint and know the contents thereof and that the same are true of my own knowledge, except as to matters which are therein stated upon my information or belief, and as to those matters that I believe it to be true.

       I declare under penalty of perjury, under the laws of the United States and under the laws of California that the foregoing is true and correct.

       Executed on April 8, 2024 at Los Angeles, California.

_____
Philip Kfoury for Cuper Development LLC, Go Cudahy LLC,
Davina LLC, Genius Distribution LLC, Daniel and Goliath LLC
and Herbal Dragon LLC

1
2

# TABLE OF CONTENTS

3   INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 2

4   PLAINTIFFS AND DEFENDANTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 5

5
6   ARTICLE I - RELEVANT CONTRACTUAL PROMISES . . . . . . . . . . . . . . . . . Page 6

7   (A).   The City Agreed that the Development Agreements Bind the City and Future Councils
        to the Obligations Undertaken . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 6
8
9   (B).   The City Agreed that the Development Agreements Guarantee the Plaintiffs Many
        Rights Including that the Project is Vested . . . . . . . . . . . . . . . . . . . . . . . . . Page 7
10
11  (C).   The City Incorporated Approved Plans Into the Development Agreements and
        Contractually Agreed that Redesigning Approved Plans is Considered a Default
12      . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 7

13  (D).   The City Agreed to Expedite Permits and Acknowledged that Delays by the City in
14      Expediting Permits is Considered a Default . . . . . . . . . . . . . . . . . . . . . . . . . Page 8

15  (E).   The City Contractually Agreed in the Development Agreement that Any Delays for
16      Emergencies (Coronavirus Pandemic) Require Waiver of Fees . . . . . . . . . . Page 9

17  (F).   The City Agreed to Hold Annual Review Hearings For Each Operator, Which Was
18      the Agreed upon Process for the Operators to Present Their Force Majeure Fee
        Waiver Delay Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 11
19
20  ARTICLE II - CITY BREACHED THE DEVELOPMENT AGREEMENTS . . . Page 11

21  (A).   The City Breached the Development Agreements by Demanding Operating Fees from
22      the Plaintiffs While They Were Not Operating . . . . . . . . . . . . . . . . . . . . . . . Page 11

23  (B).   The City Breached the Development Agreements and Violates Plaintiffs Contractual
24      Rights By Contacting State Authorities in Order to Extort Illegal Fees from the
        Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 13
25
26  (C).   The City's Scheme to Extort Illegal Fees by Issuing Temporary 90-Day Permits,
        Which is Renewed Only if the Plaintiffs are Current on Paying Disputed Fees Violates
27      the Development Agreements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 15

28

(D).    Immediately after Plaintiffs Finally Were Able to Open Go Cudahy, the City Further Schemed to Extort Plaintiffs By Demanding $200,000 in Illegal Fees or Else Face Immediate Revocation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Page 16**

(E).    The City Breached the Development Agreements by Placing Operators in Default and by Issuing 90-Day Occupancy Permits, Without a Hearing . . . . . . . . . . . . **Page 18**

(F).    The City Breached Agreements by Refusing to Waive Fees During the 15 Month Pandemic Closure in Violation of § 23(i) . . . . . . . . . . . . . . . . . . . . . . . . . **Page 19**

(G).    The City Breached Agreement by Seeking Fees During City Caused Delays . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Page 19**

(H).    The City Breached Agreements by Demanding Non-Operating Fees . . . . . **Page 20**

(I).    City Breached Agreements by Failing to Hold Yearly Review Hearings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Page 21**

(J).    The City Breached the Development Agreements by Setting Review Hearing Before a Hearing Officer Instead of the City Council . . . . . . . . . . . . . . . . . . . . . . **Page 22**

(K).    City Received and Rejected the Notice to Cure its Breach of the Development Agreements and Rejected the Claim for Damages (Gov. Code §§ 905, 945.4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Page 23**

ARTICLE III- INDIVIDUAL LIABILITY UNDER CIVIL RICO . . . . . . . . . . . **Page 25**

(A).    Extortion Of Disputed Fees under Color of Official Right . . . . . . . . . . . . **Page 27**

(B).    Mail, Wire, and Telephone Used in Scheme to Defraud . . . . . . . . . . . . . . **Page 29**

(C).    Actions by Individuals Supports a Pattern of Racketeering Activity . . . . . **Page 32**

(D).    Defendants Engaged in a Civil RICO Conspiracy . . . . . . . . . . . . . . . . . . . **Page 33**

(E).    Civil RICO Claims Support Actions for Damages to Business . . . . . . . . . . **Page 34**

ARTICLE IV- CITY REJECTED POSTING OF BOND FOR DISPUTED FEES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **Page 35**

(A).    City Rejected Demand to Post a Bond for the Disputed Fees and Proceed under Protest Pursuant to Gov. Code § § 66020, 66021 . . . . . . . . . . . . . . . . . . . . **Page 35**

COUNT 1
     BREACH OF CONTRACT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 37

COUNT 2
     VIOLATION OF THE RACKETEER INFLUENCED AND
     CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c) . . . . . . . . . . Page 38

COUNT 3
     CONSPIRACY TO VIOLATE THE RACKETEER INFLUENCED AND
     CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d) . . . . . . . . . . Page 41

COUNT 4
     VIOLATION OF EQUAL PROTECTION 42 U.S.C. § 1983 . . . . . . . . . . Page 42

COUNT 5
     VIOLATION OF DUE PROCESS 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . Page 43

COUNT 6
     VIOLATION OF GOVERNMENT CODE § 66020 . . . . . . . . . . . . . . . . . Page 44

COUNT 7
     DECLARATORY JUDGMENT (OPERATING FEES ARE ILLEGAL TAX) . . Page 44

COUNT 8
     DECLARATORY JUDGMENT (ILLEGAL IMPACT FEES WITHOUT FINDINGS)
     . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . Page 46

COUNT 9
     WRONGFUL USE OF ADMINISTRATIVE PROCEEDINGS . . . . . . . . Page 48